## 35795. Reville v. Sullivan.

Nichols, J. Mrs. Martha Sullivan brought an action against J. S. Reville to recover the value of her deceased husband's life. The plaintiff's husband died as the result of injuries received when he was riding in a motor vehicle being driven by the defendant when it collided with a pick-up truck on the night of June 26, 1953. On the trial of the case the jury returned a verdict for the plaintiff. The defendant filed a motion for new trial on the general grounds only which was denied by the trial court. It is to this judgment that the defendant excepts. *Held:*

When considering the general grounds of a motion for new trial this court must construe the evidence in that light which is most favorable to the verdict returned by the jury. *Martin* v. *Hutchinson,* 26 *Ga. App.* 24 (105 S. E. 313). Accordingly, where as here, there was some evidence to support the verdict of the jury, the judgment of the trial court denying the motion for new trial, based on the general grounds only, must be affirmed.

*Judgment affirmed. Townsend, Carlisle, and Quillian, JJ., concur. Felton, C. J., and Gardner, P. J., dissent.*

Decided October 24, 1955—Rehearing denied November 9, 1955.

*Knox & Neal, Earle Norman*, for plaintiff in error.
*Randall Evans, Jr.*, contra.

FELTON, C. J., and GARDNER, P. J., dissenting. The first count of the petition alleged: 6. On the night of June 26, 1953, Harriss E. Sullivan was riding in an automobile owned and driven by defendant on U. S. Highway #78 at a point west of Augusta. and headed in a westerly direction towards Harlem, Georgia. 7. As said automobile approached the bridge over Rocky Creek on said highway, said car was running approximately 70 miles per hour. 8. The bridge over Rocky Creek has concrete abutments on the north and south sides; said bridge is not as wide as the paved highway, and there is barely room enough for two cars to meet and pass on same. 9. Another automobile (a pick-up truck) was approaching from the opposite direction and headed east towards Augusta, and defendant failed to dim his lights, thus partially blinding the driver of said approaching truck. 10. Defendant drove his car towards the center of the highway at the aforesaid speed, and the driver of the truck, while partially blinded, attempted to avoid colliding with defendant's automobile, and in that effort, drove to his right side and struck the south abutment of the bridge, causing his truck to careen back onto the bridge while out of control. 11. When defendant saw the truck approaching, he lost control of his car and the two vehicles met and collided in the center of the highway. 12. As a result of the collision, Harriss E. Sullivan was seriously injured and was carried to the University Hospital at Augusta, where he died several hours later as a result of said injuries. 13. The proximate cause of the collision and of Harriss E. Sullivan's death was the gross negligence on the part of the defendant, the specific acts of negligence being as follows, to wit: (a) In driving said automobile at a speed in violation of the statutes of Georgia, faster than 55 miles per hour, which is negligence per se; (b) In operating said automobile at a rate of speed greater than was reasonable and safe, having due regard for the traffic and situation then existing; (c) In not dimming his lights so as to allow the operator of the approaching truck an opportunity to see the abutments on the bridge and the position of the defendant's car in the highway; (d) In driving said automobile to the center of the highway where it struck the oncoming truck; (e) In not stopping and pulling his car to his extreme shoulder and stopping before reaching the bridge in order to avoid a·collision, after seeing the truck was approaching while out of control.

The second count contained the same allegations as count one except paragraphs 6, 7, 11, 13 (a), 13 (d) and 13 (e). The corresponding new paragraphs in count two alleged: (6) On the night of June 26, 1953, at the instance of Harriss E. Sullivan, defendant drove him to Augusta and started back towards Harlem on U. S. Highway #78 at a point west of Augusta, and he was headed in a westerly direction towards Harlem, Georgia. 7. As said automobile approached the bridge over Rocky Creek on said highway, same was running more than 50 miles per hour and at a speed greater than was reasonable and safe, having due regard for the highway, the traffic, and all traffic conditions there existing. 11. As the truck approached, defendant was physically unable to operate and control his car, and the truck, while out of control, careened to its left-hand side of the center of the highway, and the said automobile in which Harriss E. Sullivan was riding, while out of control, continued to go forward without slackening its speed, and the two vehicles met and collided near the center of the highway, and slightly to Julian Reville's right-hand side of the center of the highway. 13 (a). In driving said automobile at a speed greater than was reasonable and safe under all the circumstances, and with respect to the condition of the highway at that point, including the approach to a narrow bridge, and the existing traffic conditions, which speed was in excess of 50 miles per hour. 13 (d). In continuing to drive said automobile towards said narrow bridge and towards the oncoming truck without slackening the speed of same, and while out of control, and while physically unable to operate and control same. 13 (e). In not slackening his speed and driving same to his extreme right-hand shoulder and stopping same before reaching and colliding with said on-coming truck.

Julian S. Reville, the defendant, called for the purpose of cross-examination, testified: "On the night or early morning of June 26, 1953, I was in an automobile that I owned and drove on U. S. Highway #78 coming from Augusta, Georgia, in the direction of Harlem, Georgia. I was familiar with that highway, having traveled it before. I approached Rocky Creek Bridge coming towards Harlem. The road at that place beyond ahead of me, on my side, was straight. I would say it was straight beyond the bridge for a couple of hundred yards. I approached the bridge

at that time during the hours of the night. It was dark. I couldn't say whether my bright lights were burning. As I came down the highway, before reaching the bridge, I did have lights on. I do not remember if I dimmed my lights as I approached the bridge. I did observe the lights of an oncoming vehicle meeting me. As to whether that vehicle as it got to about the point of Rocky Creek Bridge changed the direction of its lights, or whether they continued to come straight, they came straight until they came on the bridge. I guess I was about 150 to 200 yards from Rocky Creek Bridge when I first saw the lights of the approaching automobile. I was then on my right-hand side of the center of the highway, traveling about 50 to 55 miles an hour, it being then night time. As to being familiar with a 'slow' sign that controls the highway as you come from Augusta and get near this point, they have a sign there, but I am not familiar with whether there is a restricted zone along there for a mile or mile and a half, just a school zone is all I am familiar with. There was a 'slow' sign there. I said I did not notice the change in the direction of the lights of the oncoming vehicle until about the time it reached this bridge, and at the time it reached the bridge I would say I was about 150 to 200 feet from the bridge, when the oncoming vehicle went to its right-hand side and then swayed back across to the left in front of me. It looked like he first swerved to his right. There is an abutment to the bridge there on each side. I could tell he swayed enough to hit the bridge and then went back to the left. As to how far he was away from the bridge when he began to sway back towards the right, he was on the bridge, and as he left the bridge he continued to come in my direction, my side of the highway, and continued to come in that direction towards my car. He never did get his car straight again. I did not not continue to run straight ahead, but tried to get over as far as I could on my right and tried to stop. As soon as I saw he was coming across my path I tried to stop, applying my brakes. I did not have occasion after the wreck to go back and measure what that distance was. I would say I applied my brakes for 12, 15 or 20 feet. When he hit the bridge he was about 100 feet away from me, but when he came off the bridge he was much closer to me. I say I was running 50 to 55 miles an hour. When I saw him coming towards me I cut my car to the right.

I did not get my car completely off the paved road, only partly off. I didn't lack three feet of being off on the right-hand shoulder, my car lacked three feet of being to the center line. As to the highway, there being a 24-foot highway, I don't know how wide it is. I didn't have about three feet between my right-hand wheels and the extension of the paved part of the road. There was not a shoulder that was cut smooth for about six feet to the right of me—not that wide. As to there being room enough for me to get on it, I didn't have time. There was plenty of room there to do that, but I didn't have time. As to whether when I came near to where those slow signs were or speed zone signs did I slow my car down or wait until he began coming towards me to slow down, they have a sign there that they put out during school hours, but this was at night and they didn't have it there. As to there being a side road there, there is an intersection, not a cross road. I didn't slow down for that road. I collided with this vehicle about eight feet beyond there, and if it had not been for the car headed towards me I had no idea of slowing down as I approached the bridge. Until that vehicle started towards me I didn't slow down at all. My car was under control. If my car was under control I could stop it within 75 to 100 feet. I could turn it to the right and make it follow my direction immediately. I was familiar with that road, having traveled it many times. I was familiar with the slow signs and the road that came in there at Wyld's road that didn't go all the way across, and also the bridge. The bridge is a little narrower than the highway itself."

R. W. Tomlin testified for the plaintiff: "I am R. W. Tomlin, Jr., and am a deputy sheriff, Richmond County, Georgia. I have been subpoenaed in this case by both the plaintiff and defendant. I made an investigation of the collision between Mr. Reville's car and the Holliman truck on June 26, 1953, on Friday morning at 2:37 a. m. Mr. Lamar Duke, another deputy sheriff, was with me at the time and he and I investigated the collision. I had been making investigations of wrecks and collisions for about 8 years prior to this, and had had that much experience while in the sheriff's department and the Augusta Police Department. I have had enough experience in matters of this kind to form an opinion as to speed, conditions and skid marks made by cars, etc., from the physical evidence. The road

at the particular point of this collision was straight beyond this Rocky Creek Bridge and on the Augusta side of the bridge, too. From my investigation I could tell that the Holliman truck struck the bridge, striking a 12-inch abutment at the east end of the Rocky Creek Bridge, on the right-hand side. The Holliman truck was headed towards Augusta on its right-hand side of the bridge. I found marks on the Holliman car that indicated it had hit the bridge, and almost immediately in leaving the bridge there were skid marks until they finally stopped, and the pick-up truck driven by Mr. Holliman was the vehicle making these marks. Apparently the Holliman truck was traveling towards Augusta, in an easterly direction, and about two thirds of the pick-up truck had gone beyond the end of the bridge, and about the front of the right rear fender is what made the contact, and the right rear wheel hit the abutment of the bridge and that is what made contact there, and apparently when the truck went into it it threw the back end out and went down where the two vehicles collided. There was a constant skid mark all the way from where I first saw them off the abutment of the bridge to the point of impact with this car. The impact took place approximately 180 feet from the bridge, about 3 feet to the left-hand side of the center line. I still have reference to the pick-up truck. The pick-up truck was traveling east, and the tire marks indicated it made a semi-circle and went over the center line to its left and made contact with the west bound automobile coming towards Thomson. Mr. Reville's car from what I determined was on its right-hand side of the road. I believe the original paved road there was 18 feet wide, with a three-foot extension on either side, or each side, making it 24 feet wide there then, the edge of the pavement being 12 feet from the center line, and Mr. Reville's vehicle was about 3 feet from the center line, his right-hand wheels being about 3 feet from the center. There was a shoulder on Mr. Reville's right-hand side, about a nine-foot shoulder. It was a level dirt shoulder, and adjacent to the edge of this shoulder was a kind of decline into some people's yard that lived there. I believe there was room enough there to accommodate an automobile where it could have gotten completely off the pavement. As to observing any skid marks with reference to Mr. Reville's automobile, the only skid mark there

we observed at the time of the investigation was the 12-foot straight tire mark where the brakes had apparently been applied at the point of impact, and those skid marks relate to Mr. Reville's car, and were straight. They left off 12 feet back of the car from the point of impact. As from that was there anything to indicate he turned to his right at all, there was no physical evidence to indicate. I did not see anything there when I got there to make the investigation to indicate his turning further to his right where he had 2 feet on the pavement and nine feet on the shoulder. I am familiar with Wylds Road, which is a dirt road. It came into U. S. Highway 78 about 6 feet center from the east end of the bridge. It dead-ends into the highway. That would be to Mr. Reville's right. This accident happened, the best we could determine, approximately eight feet west of Wylds Road intersection with Highway 78, where the bump from the impact took place. Mr. Reville had already passed Wylds Road about 8 feet before the impact took place. As from my investigation if I was able to determine the speed of the vehicles, I would say just an approximate speed. As to whether or not in my opinion as an expert witness, a speed of 50 to 55 miles per hour at that particular place under the conditions existing there, was a safe speed or an unsafe speed, before I make a statement as to maximum safe speed, I would like to make it known that I am not a traffic expert. What I am doing is simply investigating traffic accidents, but a traffic expert has complete knowledge of all speeds, which I do not have. Gentlemen, my opinion of a maximum safe speed there was recorded at 40 miles per hour in that particular location. With reference to those 12 feet of skid marks that were behind Mr. Reville's car, we have a chart available, but I am not thoroughly familiar with it, not from memory, sir. As to whether I can form an opinion or whether or not I can now or could tell from these 12 feet of skid marks at what point Mr. Reville applied his brakes, I would rather not answer that as I could not be definite about it. Those 12 feet of skid marks would indicate that he applied his brakes for at least 12 feet."

With the use of a blackboard and a pointer, Mr. Tomlin testified on cross-examination: "If this truck had remained on its right hand side of the highway I don't believe there would have been any trouble for either vehicle to pass at the point of im-

pact. The road was 24 feet wide there. I believe that assuming even that Mr. Reville was driving 100 miles an hour he could have safely passed the truck at that point of the accident, provided the truck had stayed on its own side of the road. As to at the point I found the impact to have occurred if the truck was about three feet over on Mr. Reville's side of the highway, I would say yes from the physical evidence of the drippings from both automobiles. After the truck hit the end of the bridge it traveled approximately 180 feet before it came in contact with Mr. Reville's car. As to my giving the jury an opinion of the speed, I would estimate the truck was traveling at the time it first struck the bridge from the evidence I saw there, that would be sort of hard to do, to estimate the speed at the time it first struck the bridge. From past experience it could have been going at 40 miles an hour and lost control of it, and had a physical disability that would have let it go out of control at that distance. I would not be willing to give an estimate of the speed of the truck at the time of the impact, because we had no way of determining the speed of either vehicle. We had not enough physical evidence to give the speed of each car at the time of the accident. As to my opinion from the way the truck hit the bridge would that have speeded it up or slowed it down, I believe in the manner that the truck struck the bridge it would have more or less a tendency to speed it up just a trifle out of control. Wylds Road would have been to Mr. Reville's right-hand side while he was traveling west. As to your question, if a car had been coming up Wylds Road at the time Mr. Reville was traveling along there, and had lights on, and probably the lights would have been bright, how far could Mr. Reville have seen the car coming out of Wylds Road before he reached the road, I don't believe he would have been able to have seen the car traveling south on Wylds Road. Wylds Road as it approached Highway 78 is a semi-circle 'S' type road. In other words, it comes from behind a house and circles around a service station and then comes in, and the last stretch from the service station would be the only straight stretch there. It comes in from around the filling station. There is a stop sign there at Wylds Road as it comes into Highway #78. If there had been a car coming from Wylds Road into #78 there could have been some obstruction from the lights even though

Mr. Reville didn't see any. Wylds Road to the end of Rocky Creek Bridge is 206 feet. The width of that bridge is 18 feet. There is plenty of room on the bridge for a car and a pick-up truck to pass. I have had occasions to use a blackboard in a courtroom before a jury. I will stand before the jury and indicate on the blackboard where the accident happened at. Now I will undertake to make deductions from the diagram that we have drawn for our official record with the Sheriff's Department of Richmond County. Of course, you understand this is not drawn to scale, the inches and distances we have. It was measured by tape measure at the scene of the accident and that is the way we record our measurements on that diagram. Now we will let the two outer lines represent Milledgeville Road, U. S. 78, and the broken line is the center line of the highway. Now, entering here would be Wylds Road, and on this particular corner here is the service station that I made reference to in my statement just now about Wylds Road. Wylds Road comes out and circles this way and comes back around and then straightens out as it goes north. So we will use these markers here as the bridge end and at this point is the outer edge of the highway. Now, along this bridge here is a cement steel bannister around the walkway area to protect it, and out at this area 5½ feet from the south or right side of this bridge is an addition made on there for pedestrians to walk along there, on account of the narrowness of it in reference to the extension of the highway. Now, this is a 5½-foot walkway here, with a steel guard on the right-hand side for the protection of pedestrians from not falling down into Rocky Creek there. In our investigation of this accident we determined the pick-up truck was traveling in this direction. Now, we will say this is the truck, it got beyond the bridge about two-thirds of the way, and we will let this represent the right rear fender. When the impact with this right fender here hit this point right here, it threw this back end out more or less, which would throw it to the right just a bit, causing this vehicle to go right here. Apparently the driver jerked it to the left, which would have caused it to make a circle similar to this. From this point here to this point here is 180 feet. Now, Mr. Reville's car was over here, and he was traveling west in this manner, as the stuff off it is over in this area here, and about at this point would be approximately

8 feet from this area here, or the west end of the Wylds Road here. From about here, four feet out from here, to this point here, it was a 12-foot straight skid mark, which was three feet inside the center line to Mr. Reville's right. I say to Mr. Reville's right. He was traveling west, which would throw it on his right-hand side. The skid marks would be 12 feet in here straight to this vehicle, and at this point here is the point which the pick-up truck came across the center line in that direction, bearing in mind that this point represents a tire skid, more or less a continuous tire skid that leads from the bridge to this place. Now, the point of impact took place approximately at this point here, this truck hitting this car, the front end, and it went completely to the right, 36 feet, resting on the shoulder of the road, just off the edge of the pavement. This pick-up truck after the impact had a bouncing motion and it bounced backwards into this place here, and was about 15 feet in a semi-circle to the right and was headed towards Harlem, back out in the same lane of traffic that it was traveling in originally. Originally he was going down towards Augusta, and that would make a 15-foot circle he was bounced out in here, and this car traveled 36 feet down west on the shoulder of the road. As I say, where this point of impact took place it was approximately 8 feet in here from the end of the Wylds Road area in here. That would be about the diagram that we have recorded. The complete distance, I might add, from the center of this road here to the end of the bridge, is 206 feet. That about winds up the official diagram we have on this accident report. Now, this is the truck and that is the place right in there where the truck struck the bridge, and the truck at that time was on its extreme right-hand side of the road. I referred to this as a semi-circle or arc, the skid marks being in this arc. After this truck hit the abutment of the bridge it bounced out a short distance to this point here, and after the wheel settled down and got the momentum of the car, it could have been the pressure on these tires that caused it. All the indications were that after he struck the bridge with his truck he was completely out of control of his truck, apparently. When the truck struck the automobile that Mr. Reville was driving the truck had crossed from its extreme right-hand side of the road towards the center line and got three feet in the lane of traffic of Mr. Reville. In other words,

Mr. Reville was two feet from his own right-hand edge of the paved road, and the truck was three feet beyond the center line of the highway. The car traveled 36 feet after the impact and the truck stopped in about 15 feet in here. If I may explain further to the jury that may seem a little strange to the jury as to the position of this truck, but if you will follow the line of the arc the truck was traveling in, and there was a sudden stop, the impact, the back end of this truck would have been in a right swinging motion, and consequently after the point of impact and sudden stop, there would have been a bounce and ricochet around, if you understand what I mean. As to how much shoulder there was on the right, it was approximately the same distance on both shoulders. In other words, both sides of the highway had about a nine-foot shoulder. There was ample room for the vehicles to have passed on the bridge if they had met on the bridge, but they met 180 feet off the bridge, which is where the impact took place, beyond the bridge."

On re-direct examination Mr. Tomlin testified: "The diagram I have here is the original diagram. I cannot state about the distance from the abutment of the bridge to the point where the truck made its most extreme right-hand veer or turn at this point because, as I stated before, we didn't draw it to scale, nor can I give it to you from my recollection, approximately, because that happened about two years ago. I believe I could say that when the truck hit the abutment of the bridge it started immediately as if going to its right, according to the tracks, and then it looked as if he jerked the truck back to the left. As to your question, with those things in mind if he went immediately to his right and then suddenly jerked it back to the left, would I say the distance was 20 to 30 feet, my recollection of that, in answering that question I would say that his speed would have a lot of bearing on that particular answer. A lot of people do not react as quickly as others, and say, for instance, this man might have been going 50 miles an hour when he hit this abutment, the distance between this automobile and the point he might have jerked it back to the left could have been greater than with another person who was going 45 to 50 miles an hour. I state that absolutely as an illustration. As to whether on the right-hand side of the road where we have the filling station and Wylds Road where Mr. Reville

came along there, I would say this road was wide enough for two cars to get in, the Wylds Road. In response to your question that as Mr. Reville approached this Wylds Road, assuming that he had already seen the car approaching him, was the Wylds Road an escape place, even though that Mr. Holliman might have been negligent, was that an escape route, I will answer that according to his speed. That is a pretty close corner there where that filling station sits. As to there being some open spaces over beyond the road, on the shoulder, I would say he could have missed the road and gone on the shoulder. It was 180 feet from the bridge abutment to the point of impact. Mr. Reville's car showed only 12 feet of skid marks where he applied his brakes. We did have a talk with Mr. Reville after this accident was over with. We didn't have any great conversation with him, but some time after the accident we saw Mr. Reville at the University Hospital. As to your question did we have an opportunity to form an opinion as to whether he was physically able to control and operate his automobile at the time of the collision, I will say physical abilities, no, as apparently he was going through a stage of shock, but we were able to determine that the man had had something to drink, possibly beer or whisky, but it was not to the extent where we could tell whether his ability to operate the automobile was impaired. We did make a case against him. We did ascertain that Mr. Sullivan was injured in the wreck, and as to being seriously injured, he was to such extent that we couldn't question him, as the doctors were working on him. I know that he did later die from his injuries. As to what the signs as to the speed in that area, during the daylight hours, as there is a school in this vicinity, there was a speed zone sign of 25 miles an hour, and there are warning signs off the road coming in from the right, and also one coming from the left west of the bridge, and the normal speed I believe reverts back after school hours and into the early morning hours, and the maximum speed at that time was 55 miles an hour. The signs were there that day, they are permanently fixed. I believe the school zone speed of 25 miles an hour were for about a mile, starting a half-mile east of Bayvale School, and for a half-mile west of the school. There are speed signs on U. S. Highway 78 from the City of Augusta, where the area is zoned at 35 miles an hour, the entire area from the city

limits going west, 3.6 miles. There are also other schools in this particular area you are speaking of, between this area and the city limits. The 3.6 miles from the city limits, I believe, carries just beyond Bayvale School, up to the top of the hill beyond there."

We think the plaintiff failed to prove that the defendant was guilty of gross negligence under any of the specifications alleged in the petition or the additional specification of driving under the influence of an intoxicant treated as having been added by amendment in the absence of objection to the defendant's plea of guilty to the charge.

The defendant's testimony is unimpeached in the main and there are no circumstances inconsistent with it which would have authorized a jury to disbelieve it. If it had been disbelieved in important particulars, the circumstantial evidence did not authorize a finding of gross negligence. The defendant was shaken up and injured in the collision and it would seem that his failure to remember whether he dimmed his lights should not condemn him when he could easily have testified with impunity that he did dim them when he knew that he did not remember. The evidence fails to sustain the plaintiff's specification of negligence that the failure of the defendant to dim his lights blinded the driver of the truck and caused him to attempt to avoid colliding with the defendant's automobile and caused the driver of the truck to drive to his right side and strike the south abutment of the bridge causing his truck to careen back onto the bridge while out of control. The collision between the car and truck took place 180 feet from the bridge. If both vehicles were traveling at 50 or 55 miles per hour, they would have been approximately 360 feet apart when the truck driver hit the abutment on the bridge. Under any view they were considerably more than 180 feet apart. To arrive at the conclusion that the failure of the defendant to dim his lights caused the collision with the bridge at a distance of 300 to 360 feet requires resort to pure conjecture. Several explanations readily suggest themselves which are just as reasonable as the failure to dim the lights, if not more reasonable. There is no allegation by the plaintiff, or a contention, that the truck driver was blinded after he hit the bridge or that his being so blinded had anything to do with the collision. The defendant's

speed alone, under the circumstances, could not be gross negligence. There was no evidence of other traffic. The defendant was at all times on his side of the highway. The evidence shows that the defendant was *slightly*, if at all, incapacitated by intoxicants, in spite of his plea of guilty. It would require a high degree of conjecture and speculation to conclude that the condition of the defendant was the proximate cause of the collision or was gross negligence. There is no evidence to dispute the defendant's statement that he put on his brakes to avoid the collision and did not have time to pull off the road. The fair construction of his testimony is that he did not have time to pull off the road after he thought he was going into a collision. Even if the defendant was slow in realizing his situation and his delay in trying to stop contributed to the collision, we cannot bring ourselves to think that the defendant could be found guilty of gross negligence in not getting out of an emergency to which he did not contribute. If the defendant had been "cold" sober and the same identical collision had occurred, we do not think he would have been found to have been grossly negligent. If we are correct about that, then his having been to some small degree under the influence of intoxicants could not have had the magic power to produce gross negligence. If the defendant had been sober and had had the identical collision, whatever it was that caused him to fail to avoid it would be equivalent to the slight intoxication which it is claimed prevented him from getting out of the way of the runaway truck. In neither case could there have been gross negligence under the facts of this case when the defendant was three feet to the right of the center of the 24 foot road with his right wheels not more than two feet from the shoulder.

The violation of a criminal law in and of itself is not necessarily gross negligence. Additional circumstances are necessary and that is true even as to a violation of the "driving under the influence" statute. Neither does the rule res ipsa loquitur apply in such a case as this, especially as to gross negligence.

There is likewise no evidence to show that the defendant owed the deceased the duty to exercise ordinary care for his safety.